## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Lisa Millsap, | ) | |
| | ) | **ORDER RE: CROSS MOTIONS FOR** |
| Plaintiff, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Nancy A. Berryhill, Acting Social Security | ) | |
| Administration Commissioner, | ) | Case No. 1:18-cv-105 |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Lisa Millsap seeks judicial review of the Social Security Commissioner's denial of her application for disability insurance benefits. Before the court are competing motions for summary judgment filed by Millsap and Nancy A. Berryhill, Acting Commissioner of the Social Security Administration. (Doc. Nos. 11, 16). This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I.     BACKGROUND

### A.     Procedural History

Millsap initially applied for disability benefits on June 3, 2015. (Doc. No. 9-5, p. 2). She was determined "not disabled" on August 21, 2015. (Doc. No. 9-4, p. 2). On reconsideration, Millsap's claim for benefits was again denied in a determination dated October 22, 2015. (Doc. No. 9-4, p. 9). Millsap then requested a hearing in front of an Administrative Law Judge, which took place on May 2, 2017. (Doc. No. 9-2, p. 34-60).

On June 20, 2017, the ALJ issued an opinion denying Millsap's claim for benefits. (Doc. No. 9-2, pp. 13-25). Millsap requested review, but the Appeals Council upheld the ALJ's

decision. (Doc. No. 9-2, p. 2).

Millsap initiated this action in federal court on May 22, 2018. (Doc. No. 1). She filed a motion for summary judgment on October 15, 2018, and the Commissioner filed a combined response and motion for summary judgment on December 19, 2018. (Doc. Nos. 11, 16). There were no further responses, and the matter is ripe for the Court's review.

### B.   Medical History

Several conditions are reflected in Millsap's medical records, which span from January 2005 to May 2012. See generally Doc. No. 9 ("Administrative Record.") Her medical conditions include poor eyesight, heart disease, anxiety, depression, and cognitive limitations due to Alzheimer's disease, all of which she allege limited her ability to work during the relevant time period. These conditions are summarized briefly below.

#### 1.   Left Eye Impairment

At 18 years of age, Millsap had a cataract removed from her left eye, leaving her without a lens in that eye and causing vision difficulties. (Doc. No. 9-8, p. 10). She was eventually fitted for contact lenses and corrective surgery was discussed. (Doc. No. 9-8, p. 10-21). However, it is not apparent that corrective surgery was ever performed.

#### 2.   Heart Disease

In early 2009, Millsap experienced several episodes of chest pain. (Doc. No. 9-7, p. 19; Doc. No. 9-11, p. 22). Her providers note that she had experienced a heart attack in 2003. (Doc. No. 9-11, p. 22). She underwent left-heart catheterization on April 7, 2009, and bypass surgery on May 6, 2009. (Doc. No. 9-7 at 19, 24-28). After the surgery, she attended rehabilitation from May 14 until May 20 due to lingering mental fogginess and weakness. (Doc. No. 9-7 p. 48-51).

By June 2, 2009, she was described by her cardiologist as "back to normal. Her memory is totally normal, and she does not have any focal deficits." (Doc. No. 9-12, p. 40).

On October 13, 2011, she again reported to Trinity Hospital because of chest pain. (Doc. No. 9-9 at 2). On December 19, 2011, she had a left heart catheterization performed. (Doc. No. 9-12, p. 80).

### 3. Anxiety and Depression

In 2007, Millsap was diagnosed with depression, and attended therapy sessions for several months. (Doc. No. 9-12 at 10-23).

On January 18, 2010, a behavioral health assessment was performed by Nicole Amsbaugh, who noted that Millsap's depression was effectively controlled by medication and planned to continue her current regimen. (Doc. No. 9-12, p. 44). Millsap followed up with Amsbaugh every few months over the next several years. (Doc. No. 9-12 at 48, 50, 52, 54, 61, 63, 67, 82, 84; Doc. No. 9-14 at 76, 80, 86). Other providers occasionally note her depression and/or anxiety. See, e.g., (Doc. No. 9-9, p. 9).

### 4. Memory and Cognitive Problems

Millsap first suffered memory issues after her heart surgery in May 2009 which resolved by the following month. (Doc. No. 9-12, p. 40).

In June 2010, Millsap mentioned that she is "seemingly getting forgetful" to Amsbaugh. (Doc. No. 9-12, p. 50). She denied feeling any confusion at that time.

The next mention of memory occurs in December 2013, when Millsap reports to Amsbaugh that her husband is concerned about her memory and confusion. (Doc. No. 9-14 at 76).

3

From June 2014 to May 2015, Millsap underwent a series of neuropsychological evaluations and assessments, with all providers noting cognitive dysfunction, although some questioned the validity of the results. (Doc. No. 9-12, p. 86; Doc. No. 9-14, p. 47; Doc. No. 9-12 at 93, 97; Doc. No. 9-13, p. 3). Millsap was ultimately diagnosed in May 2015 with dementia secondary to early onset-Alzheimer's. (Doc. No. 9-13, p. 8).

After her diagnosis, she started medication, and saw a psychologist to work through her stress. (Doc. No. 9-13, p. 24). One neurologist who saw her in 2016 expressed doubt as to the Alzheimer's diagnosis, and opined that she was suffering from "pseudodementia" due to her anxiety and depression. (Doc. No. 9-14, p. 10-11). She was referred to occupational therapy and completed one session before being discharged and told to complete home exercises. (Doc. No. 9-14 at p. 3-5).

### C.    Personal History

Millsap was born on May 27, 1960, making her 50 years old on her alleged disability onset date of May 27, 2010. (Doc. No. 9-6, p. 2). She is married and has two adult children. Id. at p. 70.

Millsap completed high school and one year of college. (Doc. No. 9-12, p. 8). She performed several jobs over the years, working as a cashier, an accounting clerk, and a bank teller. (Doc. No. 9-6, p. 19). She was dismissed from the bank in March of 2006, and afterwards did some seasonal work in 2008 for a nursery. (Doc. No. 9-2, p. 41-42).

## II.    APPLICABLE LAW

### A.    Law Governing Eligibility for Disability Benefits

A disability is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when they are not only unable to do their previous work, but cannot—considering age, education, and work experience—engage in any other kind of substantial gainful work which exists in significant numbers in the region where they live or in several regions across the country. 42 U.S.C. §§ 423(d)(2)(a), 1382(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; see <u>Kirby v. Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the Commissioner moves onto step two.

At step two, the Commissioner determines "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." <u>Dixon v. Barnhart</u>, 353 F.3d 602, 605 (8th Cir. 2003). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). Abilities and aptitudes includes: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and

usual work situations; and (6) dealing with changes in a routine work setting. Id.; see also Bowen v. Yuckert, 482 U.S. 137 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [their] ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner considers the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); see Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998). If the claimant's impairment is severe, but does not meet or equal one of the presumptively disabling impairments, then the Commissioner will determine the claimant's residual functional capacity ("RFC"). 20 C.F.R.§§ 404.1520(a)(4((iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). To determine a claimant's RFC, the Commissioner examines the claimant's physical abilities to work. See Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).

At step four, the Commission examines medical and non-medical evidence in determining if the claimant has the RFC to perform past relevant work. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

At step five, if the claimant does not have the RFC to perform past relevant work, the Commissioner then has the burden to show there is other work the claimant can still do. See Bladow v. Apfel, 205 F.3d 356, 358–59 n. 5 (8th Cir. 2000). If the Commissioner determines the

claimant has the RFC to perform some work, the Commissioner must then show that the work claimant is able to do exists in significant numbers in the national economy. <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 591 (8th Cir. 2004).

### B.    Standard of review

Upon review of the entire record, the court can affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for rehearing. 42 U.S.C. § 405(g). To affirm the Commissioner's decision, the court must find that substantial evidence appearing in the record as a whole supports the decision. <u>See Id.</u>; <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184 (8th Cir. 1989). As the Eighth Circuit has repeatedly stated, the "substantial evidence on the record as a whole" standard demands more rigorous review than the "substantial evidence" standard:

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

<u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009) (citing <u>Wilson v. Sullivan</u>, 886 F.2d 172, 175 (9th Cir. 1989)). <u>See</u> <u>also</u> <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998).

The court may disturb an ALJ's decision only if the decision lies outside the available "zone of choice." <u>Nicola v. Astrue</u>, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). An ALJ's decision is not outside the "zone of choice" simply because a court might have reached a different result had it been the initial trier of fact. <u>Id.</u>

III.   **ANALYSIS**

It is difficult to parse Millsap's exact claims. Her brief includes broad, boilerplate criticisms which are ostensibly directed at the ALJ's decision, but in reality are untethered to the instant case. In some instances, Millsap criticizes the ALJ for actions the ALJ did not actually take and cites medical events which did not actually occur. Relying on facts both supported by the record and relevant to Millsap, her contention appears to be that she was totally disabled because of her cognitive difficulties secondary to early-onset Alzheimer's. The bulk of Millsap's criticism seems directed at the ALJ's RFC assessment, wherein the ALJ found that Millsap could perform less than the full range of light work and, based on vocational expert testimony, that she was employable.

As such, this Court must analyze whether the ALJ's RFC assessment was supported by substantial evidence. First, the Court will recount the ALJ's analysis, particularly in reference to Millsap's cognitive difficulties and/or mental health issues. Then, the Court will summarize the evidence of record regarding these issues. Finally, the Court will consider Millsap's specific arguments.

A.   **ALJ's Findings**

The ALJ issued his written opinion on June 20, 2017. (Doc. 9-2, p. 13).

He first noted that Millsap's date last insured was September 30, 2011, and explained that his decision would therefore address the period between May 27, 2010, her alleged disability onset date, until September 30, 2011. Id. at 18. He found that Millsap did not engage in substantial gainful activity during that time.

The ALJ proceeded to find that Millsap suffered from the following severe impairments

through the date last insured: coronary heart disease, depression, and anxiety. Id. He considered her left eye impairments, but noted that since she worked with this condition in the past, it was non-severe.

The ALJ then concluded that Millsap did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  Considering first listings 12.04 and 12.06, he noted that Millsap had mild limitation in certain areas, e.g., in learning, recalling, and using information, but that she lacked the marked limitations required to meet a listing in Paragraph B of either listing. Id. at 20. He also analyzed the Paragraph C criteria, but concluded that the evidence failed to establish the existence of a disorder over a period of two years together with the requisite reliance on treatment and marginal capacity to adjust to changes in daily life. Id. at 20.

The ALJ next made findings regarding Millsap's residual functional capacity ("RFC"), concluding that she could perform less than a full range of light work as defined in 20 C.F.R. § 404.1567(b). Specifically, the ALJ found that during the relevant period, Millsap retained the mental residual functional capacity to understand, remember, and carry out short, simple instructions, and was limited to frequent interaction with supervisors, coworkers, and the general public. Id. at 20. He found that she could have responded appropriately to changes in a work routine setting and make judgments on simple work-related decisions. Id.

The ALJ explained that he came to his conclusions based on the alleged symptoms and the extent to which they could be considered consistent with the objective medical evidence. Id. at 20-21. He found that while Millsap's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, her statements concerning the "intensity,

persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. at 21.

The ALJ then performed an analysis of the medical evidence of record. Regarding Millsap's history of heart problems, the ALJ noted that her condition always stabilized quickly after her procedures and that she generally denied relevant symptoms, i.e., shortness of breath, during office visits. Id. at 23. While acknowledging her heart condition would have caused some limitation, he accepted the State agency consultant's most recent opinion that she could perform work within a light exertional range. Id.

Regarding Millsap's anxiety and depression, he discussed her treatment records from January 2010 to March 2012. Id. at 22. He noted that at times she suffered increased symptoms and crying spells, but that her condition apparently stabilized, and that she described herself as "very good" and "happy" by November 2011.  Id.

The ALJ also explained his analysis regarding Millsap's alleged memory issues. Addressing the testimony regarding her memory problems, he acknowledged that the medical record contains a diagnosis of early-onset dementia with severe effects on her mental capacity. Id. at 22. However, he noted that the dementia diagnosis comes several years after the date last insured, and determined that "the record does not support that the claimant had this level of memory issues, or any at all, during the relevant timeframe." Id. at 22-23. As such, he explained, he "does not consider the impact the claimant's dementia has on her ability to function, as this diagnosis came years following her date last insured." Id. at 23.

The ALJ also cited Millsap's work history, noting that it is sporadic and suggests "poor work motivation." Id. He also pointed to her global assessment of functioning score, indicating

"mild difficulties in social, occupation or school functioning," and the assessments of State agency consultants, as justifications for his residual functional capacity. Id.

Having thus provided the justification for his RFC assessment, the ALJ then found that Millsap was unable to perform any of her past relevant work, nor did she have the RFC to provide the full range of light work. Id. However, relying on the vocational expert testimony, he concluded that Millsap was capable of making a successful adjustment to other available work. Id. at 24-25. As such, he found her not disabled from May 27, 2010, her alleged disability onset date, until September 30, 2011, the date last insured. Id.

### B.    Medical Records Relating to Mental Health and Cognitive Issues

Millsap argues that she was disabled from her May 27, 2010, through September 30, 2011, her date last insured. However, she supplies many medical records from outside this time period.

### 1.    Evidence from 2007 through 2009, predating the disability period.

The earliest record of Millsap's mental health condition stems from August 23, 2007, when Millsap was referred to Jean Frueh for counseling by her primary care physician after discontinuing birth control. (Doc. No. 9-12, p. 5). Millsap reportedly worried this medication change would cause a resurgence of depression symptoms which had first emerged after her heart attack in October 2003. Id. Millsap noted that her symptoms had improved over the last few weeks due to a dosage increase in the Effexor, a medication which had taken for many years. Id. at 7. She was provisionally diagnosed with major depressive disorder and premenstrual dysphoric disorder. Id. at 8-9. Frueh recommended "weekly therapy to work to improve mood,"

with emphasis on coping skills, resolution of "relationship hurts," and mood management strategies. Id. at 10.

For several months after her assessment, Millsap returned to Frueh for therapy sessions. See id. at 10-23. Much of the resulting medical records summarize conversations about Millsap's personal struggles, such as conflict with her daughter. At one point during this time period, she was prescribed Paxil to help with anxiety symptoms by a doctor at 5th Medical Group Internal Medicine Clinic ("the Clinic"). (Doc. No. 9-11, p. 44). Millsap's last visit with Frueh appears to have been on November 19, 2007. (Doc. No. 9-12, p. 23).

In February 2009, Millsap visited the Clinic for chest pain, depression, and medication questions. (Doc. No. 9-11, p. 22). She was said to be "doing well" on her current regime of Paxil and Effexor.

In May 2009, approximately a year prior to her alleged onset date, Millsap had heart bypass surgery. (Doc. No. 9-7, p. 27). Immediately after the surgery, she was slow to recover, experiencing physical weakness and mental difficulties such as confusion. (Doc. No. 9-7, p. 48). Accordingly, she was admitted to rehabilitation on May 14 and was discharged on May 20. (Doc. No. 9-7 p. 50). Her discharge summary for rehab noted that Millsap eventually did "come around very slowly." Id. Speech was consulted for her memory lapses, and comprehension scores were 6 out of 7 and memory scores 5 out of 7 on discharge. Id. at 51.

At a follow-up on June 2, 2009, Millsap's cardiologist discussed her post-surgery cognitive difficulties, and described her as "back to normal." (Doc. No. 9-12, p. 40). He went on, "Her memory is totally normal, and she does not have any focal deficits." Id.

Notes from Millsap's post-surgery evaluation at the Clinic on September 17, 2009, reported that she "is going great overall and has essentially returned to her usual activities. . . patient continues to do very well on her current regiment for depression/anxiety." (Doc. No. 9-11, p. 4).

### 2.    Medical Records from 2010

On January 5, 2010, several months before her alleged onset date, a note from a Clinic visit reflects that Millsap is "doing well" on her depression medications of Paxil and Effexor, "an uncommon but seemingly effective regimen." (Doc. No. 9-10, p. 84-85). The provider, described later as a new primary care physician, noted that he would keep her on the regimen for the present as Millsap had been on the medications for two years, but referred her to psychiatry as apparently had been done previously, but never followed up on. Id.

In response to this referral, a behavioral health assessment was performed by Nichole Amsbaugh on January 18, 2010. (Doc. No. 9-12, p. 44).

Amsbaugh noted that Millsap had a long history of depression, and has been on a combination of Paxil and Effexor for two years. Id. When asked how the medications were working, Millsap responded "they work great." Id. She noted that her crying and decreased mood had resolved, and the combination of medication "works quite well." Id. She noted fatigue and that she needs to "rest a bit more." Id. Millsap reported that her concentration was "better than ever." Id. She reported intermittent suicidal ideation since age 12. Id. at 45. Amsbaugh also performed a mental status exam, and describes Millsap as having "logical and linear" thought processes. Id. She wrote that Millsap sometimes gives too much information in response to

specific questions.  Id. She wrote, "Her memory is intact both recent and remote. Her insight and judgment are good." Id. at 46.

Amsbaugh then wrote that Millsap should continue her current medication regimen, because she has been on it for three years and "feels she is doing wonderful." Id.

On March 31, 2010, Millsap followed up with Amsbaugh. (Doc. No. 9-12 at 48). Millsap related that her depression was improved and the provider planned to discontinue her Paxil. Id. In performing mental status exam on Millsap, Amsbaugh noted that she was quiet, shy, and difficult to engage with some incongruencies in the information related, yet she appeared honest. Id.

On June 8, 2010, Millsap followed up again with Amsbaugh. (Doc. No. 9-12, p. 50). She reported trouble reducing her Paxil dosage, and decided to stay at the 20 mg level. Id. She denied confusion, but mentioned that "she seemingly is getting forgetful," speculating that this could be because she just turned 50. Id. Millsap also reported feeling suicidal when decreasing the Paxil, but was not suicidal currently. Id. Her mental status was described as initially quiet, but then engaging and involved, with logical and linear thought processes and regular rate and tone of speech. Id. at 51.

On September 14, 2010, Millsap followed up again with Amsbaugh. Id. at p. 52. She reported that she was feeling depressed, crying, feeling down, and experiencing a lack of energy and disinterest in activities. Id. She was agreeable to increasing her Paxil dosage back to 40 mg. Id. She revealed that she was feeling suicidal. Id. She also related a number of interpersonal stressors, disclosing for the first time that she does not get along with her daughter, and that her

granddaughter, who was visiting for the summer, was planning to move in permanently, causing tension between her and her husband. Id.

On December 1, 2010, Millsap followed up again with Amsbaugh. Id. at 54. She reported that she had been crying a little, but "definitely better" than previously. Id. She reported an improved mood, less irritability, and denied suicidal thoughts as things were going relatively well. Id. Overall, she reported being "pleased with the way the Effexor has managed." Id.

### 3.    Medical Records from 2011

On January 12, 2011, a Clinic provider noted in a review of systems: "Psychological symptoms: no anxiety and no sleep disturbances. Anhedonia tearful sometimes." (Doc. No. 9-10, p. 78).

On January 15, 2011, during an admission for chest pain, a doctor noted her past medical history of depression, writing she is "on medication and doing good." (Doc. No. 9-8, p. 41).

On January 26, 2011, her cardiologist noted that Millsap had "severe anxiety issues" and had asked him to be referred to a primary care doctor at his hospital. (Doc. No. 9-12, p. 59).

On March 29, 2011, she followed up again with Amsbaugh. (Doc. No. 9-12, p. 61). She mentioned her recent diagnosis of anxiety from her cardiologist. Id. She cried when discussing it with Amsbaugh. Id. She stated that she had lost weight because she did not feel like eating. After hesitating, she disclosed her son announced his upcoming wedding, and every day since then she had been throwing up, and felt as though she is losing her son and best friend. Id. She spoke extensively to Amsbaugh about her problems with her son's relationship. Id. Amsbaugh recommended the drug Remeron, stating, "this seems to be more a situational stressor, and patient is expressing feelings of abandonment." Id. Millsap reported that she awoke that morning

feeling fine, but thinking about the marriage depresses her mood. During the mental status exam, Amsbaugh described Millsap as becoming very tearful, hyperventilating, and able to do some deep breathing exercises. Id. at 62.

On May 5, 2011, she followed up again with Amsbaugh. Id. at 63. Her husband attended the appointment. Id. She stated she feels the Effexor is working, but thought that there may be "room for improvement" and was interested in increasing the dosage. Id. She said that at time she is anxious and has to use the Xanax, but it made her sleepy. Id. She reported crying spells at time that come out of nowhere but are "much less." Id. She reported taking an extra Effexor to control these crying spells two-three times a week. She mentioned feeling sleepy and low-energy. Id.

On October 26, 2011, she followed up again with Amsbaugh. (Doc. No. 9-12, p. 67). She stated she had a "difficult time" over the summer, and had undergone chest pain and stent placement.  Id. She said that over the last month and particularly the last week, she felt "very good," and "happy." Id. She reported no difficulty with sleep and that her energy was beginning to improve. Id. She noted that cardiac rehabilitation had helped her energy returns. Id. She also reported her weight loss and nausea was a result of her cholesterol medication and had improved. Id. In her mental status exam, Amsbaugh wrote that Millsap's facial expression was animated, and she was much more talkative, reporting a good mood.

On December 19, 2011, her cardiologist noted her heart symptoms and wrote, "aside from the above, she feels good. She has no other significant symptoms. She was a bit tearful in the office." (Doc. No. 9-12 at 70).

**4.      Medical Records After the Date Last Insured, from 2012 to 2017**

On February 29, 2012, Millsap followed up again with Amsbaugh.  (Doc. No. 9-12 at 82). She stated she was "feeling much better," with reduced stress and greater calmness. Id. She explained her energy is good some days and that she is able to care of housework, and that she is crying less, less irritable, and things are "going much better in her life." Id.  Her mental status exam revealed "her thought processes are logical and linear," and her mood was "very good." Id.

On July 17, 2012, she again followed up with Amsbaugh. Id. at 84. She was "quite tearful," and explained that she had a lot of stress because her granddaughter. Id. She stated that her mood is low, she cries continuously, and her anxiety level ramped up when her granddaughter came and rises the longer she is here. Id. She expressed passive suicidal thoughts. Id. at 85.

On March 18, 2013, she followed up again with Amsbaugh. (Doc. No. 9-14 at 86).  She reported that her depression had decreased over the last several months, reporting her good is mood, and some days she feels happier than she has felt in a long time. Id. She was back to her activity of horseback riding and has even purchased a pony. Id. She reported that summer is usually stressful because her granddaughter visits, but now, it seems that her granddaughter might not visit. Id. Amsbaugh wrote that Millsap's thought processes were logical and linear, insight and judgment were good,  memory was intact, and her affect was very bright. Id. at 87.

On September 16, 2013, Millsap visited Amsbaugh at the behavior health clinic. Id. at 80. She reported increased depression over the last few months, anxiety, and irritability. Id. She stated her anxiety is primarily because she feels her husband is tired of her illness. Id. She has conflict with her granddaughter, daughter, and husband. Id. at 80-81. Psychiatrically, Amsbaugh

noted that her insight and judgment were limited, her memory appeared to be intact, and her mood depressed. Id. at 81.

On December 9, 2013, she visited Amsbaugh at the Behavioral Health Clinic. (Doc. No. 9-14 at 76). Her chief complaint is that her husband is concerned about her memory, confusion, crying, and difficulty focusing. Id. She says she has trouble completing tasks and gets lost in conversation which upsets her husband. Id. She reported nervousness because she was worried she was not telling the right symptoms, but reports her mood and activity level is good. Id. at 77. Amsbaugh ultimately ordered neuropsychological testing and noted that Millsap had complained of memory problems in the past. Id. at 78.

On June 24 and June 26, 2014, she underwent a neuropsychological evaluation in Kearney, Missouri, following an admission to the mental health unit of a local hospital on June 17, 2014. (Doc. No. 9-12, p. 86). The evaluation consisted of a diagnostic interview, mental status examination, and cognitive testing. Id. at 87. The psychologist suggested the diagnosis of major neurocognitive disorder and mood disorder, with severe difficulty functioning. Id. at 89. He noted significant difficulties with cognitive function and significant memory difficulties. Id. at 89-90.

On September 26, 2014, she was referred to the neurology clinic for evaluation and management regarding her neurological symptoms, and saw Dr. SaId. (Doc. No. 9-14, p. 47). Her husband reported that for the last five years or so she has suffered from memory problems that have gradually worsened over time and became more prominent in the last two years. Id. He reported that she repeats question and forgets people's names. Dr. Said performed a mini mental status exam. Id. at 48. He instructed her to return in four weeks. Id. at 49.

On October 20, 2014, Millsap returned to the neurology clinic. Dr. Said discussed her previous EEG and MRI results, planned to follow up with a PET scan, and referred them to Mayo Clinic at their request. Id. at 40.

Another neuropsychological assessment was performed on January 19, 2015, by Dr. Rodney Swenson. (Doc. No. 9-12 at 93). Ultimately, the psychologist determined that the testing was "unfortunately clinically suboptimal" in terms of validity. Id. at 95. He opined that the test results underrepresented her neuropsychological capacity yet accurately confirmed that she is functioning abnormally. Id. He concluded by recommending that she undergo studies which do not require patient effort, such as neuroimaging studies. Id. at 95.

A week later, on January 26, 2015, Millsap returned to Dr. Swenson to discuss her test results. (Doc. No. 9-12 at p. 97). Dr. Swenson noted that Millsap remembered her earlier visit, and stated that if one were to take her previous testing results at face value, she would not remembered it at all. Id. He reaffirmed the need for further diagnostic workup as the neuropsychological testing was not sensitive or specific enough to determine her condition. Id. at 98.

On May 19, 2015, Millsap visited the Mayo Clinic for several assessments. (Doc. No. 9-13, p. 3). She was first evaluated by Dr. Eoin Flanagan, who took a history from the patient and her husband indicating that she first developed symptoms between 2000 and 2003, and had struggled a little bit at work. Id. at 4. He wrote, "over the last five years in particular, things have progressed," and described her troubles with forgetfulness and word-finding. Id. Dr. Flanagan reviewed her past testing and MRI, and arranged for a PET scan to be performed. Id. at 5-6.

19

On the same date, Millsap was also evaluated by Dr. Knopman at the Mayo Clinic. Id. at 6. He recounted her history of cognitive difficulties that has gradually worsened. Id. He also noted that she had anxiety and depression which led some observers to wonder whether her primary diagnosis was psychiatric. Id. He noted that the mental status exam performed by Dr. Flanagan showed substantial cognitive impairment. Id. at 8. He attributed her symptoms to neurodegenerative disease, and confirmed that  PET scan will be performed. Id.

Later on May 19, 2015, Dr. Flanagan reviewed Millsap's PET results. Id. at 3. He stated that they were consistent with young-onset Alzheimer's disease. Id. He prescribed Aricept and counseled Millsap on staying active.  Id.

On August 10, 2015, she was seen at the Neurology Clinic at Trinity Hospital. (Doc. No. 9-14, p. 21). Dr. Lee noted a history of progressive memory loss for 5 years or longer, assessing it as "probably Alzheimer disease." Id. He noted that the Aricept prescribed to her at the Mayo Clinic was helpful. Id. at 22.

On October 19, 2015, Millsap visited psychologist Mary Solberg for clinical intake. (Doc. No. 9-13, p. 24). She was seeking treatment to "work through her medical issues and dealing with Alzheimer's. Id. Dr. Solberg wrote that she would treat Millsap with cognitive behavioral therapy to increase coping techniques for stressful situations. Id. at 26. Millsap followed up with her again on November 2 and December 21, 2015, as well as February 15, 2016, mostly discussing life history and events. Id. at p. 21-26.

On March 14, 2016, Millsap visited the Neurology Clinic at Trinity Hospital. (Doc. No. 9-14, p. 10). The Doctor noted that she had a history of memory difficulties for the past year, possibly related to Alzheimer's. Id. She complained of headaches, which the doctor opined were

myofascial in origin. Id. at 11. He noted that she appeared severely depressed, and noted that she had personal issues with her husband. Id. He stated, "Finally, I am somewhat concerned that a 55-year-old female with really no past medical history or no clear genetic disposition for Alzheimer's disease is diagnosed with a dementia. In my opinion, I do feel that she is experiencing a form of pseudodementia from the anxiety and depression." Id.

On March 28, 2016, she attended an occupational therapy initial evaluation. (Doc. No. 9-14 at p. 3). The "reason for referral" was given as Alzheimer's. In the notes for "Home Environment," "Patient's Responsibilities" were listed at "Caregiver for child/parent/spouse, Driving, Housework, Laundry, Meal Preparation, Other: leisure includes horse riding, 4 wheelers, camp." He recommended a home exercise program. Id. at 5. A note entered on June 17, 2016, indicates she did not return for therapy and was discharged back to her doctor's care. Id. at 3.

### C.    Hearing Testimony

At the hearing, Millsap herself testified briefly. (Doc. No. 9-2 at 39). She explained that she had trouble at work due to confusion. However, she expressed difficulty answering counsel's questions, and agreed to his suggestion that her husband, Melbourne, testify instead. Id. at 40.

Melbourne reported that Millsap was fired from her job at the bank for shredding the wrong documents. Id. According to counsel's clarification, this firing occurred in March of 2006. Id. at 42.

When asked about his wife's condition in 2010, the start of the relevant period, Melbourne testified that Millsap needed to sleep all the time, and that she had confusion and lack of focus which worsened over time. Id. at 43. He testified that she would forget to take care of

the family's horses and dogs and forget to take showers. Id. Melbourne also described Millsap's problems turning on and using a computer and writing checks. He stated that she would forget how to write her own name, and how to write in general. Id. at 45.

When asked by Millsap's attorney whether she would have been able to work in 2010, Melbourne reported that she would not have been able to keep to an employer's schedule and would require a great deal of patience during the day. Id. at 46-47. He testified that she often had uncontrollable crying spells, and stopped engaging with other people. Id. at 47. He stated that her condition as of the hearing date was was very similar to her condition in 2011, and gave specific examples from the relevant time period such as failing to recognize friends, and being unable to unlock a car door. Id. at 51.

Melbourne also submitted a written statement. (Doc. No. 9-6, p. 71). He states that she had problems focusing and negative thoughts as early as September 2007, and memory issues as early as June 2008. Id.

Millsap's daughter also submitted a partial statement, attesting to "subtle differences and changes" prior to June 2011, such as forgetting how to operate a camera and losing her train of thought. (Doc. No. 9-6, p. 69).

**D.**      **Millsap's Arguments**

Millsap makes several arguments, some broad and some general. They are addressed sequentially below.

**1.**      **Whether the Medical Records Generally Support the ALJ's RFC Determination**

Millsap claims that the medical records in general support her claim of debilitating cognitive issues. She writes that her anxiety and depression caused "severe limitations," and that she suffered cognitive issues such as learning, processing information, and memory loss that were "debilitating" during the relevant time period. The Commissioner responds at length, citing in detail to the record in support of its argument that the contemporaneous medical evidence fails to support the limitations Millsap alleges. As such, the Commissioner urges that this Court affirm the ALJ's analysis.

Turning first to the records pertaining to depression and anxiety, the Court is not persuaded by Millsap's claim that they show severe limitations. Before the relevant period, Millsap's depression seems effectively controlled by medication. She did not appear to seek treatment at all between November 2007 and January 2010, during which time her depression appears to have been well-controlled by her combination of Paxil and Effexor. (Doc. No. 9-10, p. 84-85). As of March 31, 2010, just before her alleged onset date, she reported improved depression and planned to discontinue her Paxil. (Doc. No. 9-12 at 48).

During the critical the period between May 2010 and September 2011, Millsap shows some struggles with depression and anxiety. However, these are largely tied to interpersonal issues. For instance, when she reports depression and crying spells to Amsbaugh in September 2010, her feelings of "overwhelming" stress stem from current conflict with her daughter and her husband. (Doc. No. 9-12, p. 52-53). Similarly, when Millsap told Amsbaugh in March 2011 that she was losing weight because she did not feel like eating, she admitted that her emotional turbulence resulted from her son's upcoming wedding and negative feelings about her new daughter-in-law. (Doc. No. 9-12, p. 61). At the time, Amsbaugh prescribed additional medication

and wrote, "This seems to be more a situational stressor, and patient is expressing feelings of abandonment." Id.

The medical evidence from the relevant period also reflects stretches of time in which Millsap's symptoms were apparently resolved. In December 2010, Millsap describes herself as "definitely better," and "pleased" with her medication. (Doc. No. 9-12, p. 54). In October 2011, approximately a month after the end of the relevant period, she reports feeling "very good" and "happy." Id. at 67. By February 2012, almost six months after the date last insured, she reports to Amsbaugh that she feels "much better," with reduced stress and greater calmness. Id. at 82. She stated that her energy is good some days and that she is able to take care of housework, and that she is crying less, less irritable, and things are "going much better in her life." Id.

In short, the Court agrees with the ALJ's assessment that the majority of records from the relevant period show that Claimant's condition was well-controlled through medications, and that increased symptoms "were caused by situational stressors caused by her family." The Court does not agree with that Millsap's contention that the record reveals "severe limitations" from her depression and anxiety. At the very least, the ALJ's decision to find her only mildly to moderately limited from these conditions is supported by substantial evidence on the record as a whole.

The Court also finds that Millsap's claims of severe cognitive limitations during the relevant timeframe, such as memory loss or difficulty concentrating, are not supported by the medical records. About a year before her alleged onset date, she does indeed suffer short-term cognitive difficulties after surgery in May 2009, requiring admission to rehabilitation. (Doc. No. 9-7, p. 48-50). Yet she was described as "back to normal," with a "totally normal" memory by

the following month. (Doc. No. 9-12, p. 40). Similarly, in a follow-up at the Clinic in September, her provider writes that Millsap "is going great overall and has essentially returned to her usual activities" and patient "continues to do very well on her current regiment for depression/anxiety." (Doc. No. 9-11, p. 4). These objective medical records describe a medical condition that has resolved.

The next mention of Millsap's memory issues – and the only one during the relevant timeframe – comes on June 8, 2010, when she describes herself to Amsbaugh as "seemingly" forgetful.  (Doc. No. 9-12, p. 50). Yet at the same visit, she denied confusion, and her thought processes are described as logical and linear. Millsap does not complain of memory problems again until December 9, 2013, three and a half years after the June 2010 mention of forgetfulness and over two years after the date last insured. At that point, Amsbaugh ordered neuropsychological testing; it is not until June 2014 that a neuropsychological evaluation reveals difficulties with cognitive function and memory. (Doc. No. 9-12, p. 86-90). Even after that point, doctors seem to struggle to pinpoint the extent of her limitations. <u>See</u>, <u>e.g.</u>, Doc. No. 9-12 at 93, (Dr. Swenson noting "clinically suboptimal" test results in January 2015). Even after Millsap's diagnosis of dementia, at least one of her treating physician disputes the diagnosis, postulating that she is instead suffering from "pseudo-dementia" from anxiety and depression. (Doc. No. 9-14, p. 10).

Millsap seems to argue that her 2015 dementia diagnosis should be interpreted as causing her symptoms from 2010-2011. It is true that medical evidence after the date last insured "can be relevant. . . in helping elucidate a medical condition during the time for which benefits might be rewarded," <u>Pyland v. Apfel</u>, 149 F.3d 873, 876–77 (8th Cir. 1998). But here there is little to

elucidate, considering the vanishingly mild symptoms reflected in Millsap's medical records. The two-year gap between the date last insured and Millsap's first serious complaint of symptoms does little to establish the presence of a disabling condition before her insured status expired. The ALJ did find some limitations during the relevant period. See Doc. No. 9-2, p. 18 (ALJ noting mild limitations with regards to understanding, remember, and applying information, and moderate limitation with regards to concentrating, persisting, and maintaining pace). The ALJ's assessment of the severity of her cognitive limitations during the relevant time period is well within the "zone of choice."

### 2.     Dr. Knopman's 2017 Letter

Millsap makes several specific arguments on the basis of an April 24, 2017 letter written by Dr. Knopman, a treating physician.  She contends that the ALJ should have re-contacted Dr. Knopman to gain further information as to his opinion, and argues that the ALJ improperly substituted his judgment for that of a physician when he declined to find Millsap disabled on the basis of the letter.

Dr. Knopman's letter reads in its entirety:

> I saw Mrs. Lisa Millsap on April 20, 2017, and had first met her and examined her on May 19, 2015. She has a diagnosis that is unequivocal to dementia due to Alzheimer's disease that is moderately severe at this point. In retrospect, she was experiencing cognitive difficulties for at least ten years before we diagnosed her in 2015. There is no question that she was experiencing cognitive functioning issues for many years preceding her diagnosis, and it is reasonable to conclude that it is all part of the same process that has currently reached the severe stage now.

(Doc. No. 9-14, p. 88).

Millsap summarizes the above letter, writing, "[t]here was no equivocation about the opinion nor contradiction of record. The ALJ failed in his duty to develop the facts fully and fairly…"

The Commissioner responds that Millsap herself bears the burden of submitting medical evidence, and that the record in this case contains ample evidence to support the ALJ's decision. The Commissioner then discusses the evidence of record, arguing that the contemporaneous medical evidence from the period of May 2010 to September 2011 contradicts Millsap's claims of severe cognitive difficulties during this timeframe. The Commissioner also criticizes Dr. Knopman's 2017 opinion as conclusory, retrospective, and unsupported by the medical evidence.

As a threshold matter, the Court agrees with the Commissioner that the ALJ did not fail in his duty to develop the record by failing to recontact Dr. Knopman. While the ALJ has a duty to develop the record, Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004), the ALJ is only required to develop a reasonably complete record even when claimant is pro se. Whitman v. Colvin, 762 F.3d 701, 707 (8th Cir. 2014). Here, claimant is represented by counsel. The record here contains extensive medical records from 2005 until 2017, as well as hearing testimony and opinions from State agency physicians. The ALJ's decision to refrain from expanding the record further was appropriate and is supported by substantial evidence.

The next issue is the ALJ's treatment of Dr. Knopman's 2017 letter. A treating physician's opinion is given controlling weight *if* "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Whitman v. Colvin, 762 F.3d 701, 706 (8th Cir. 2014), citing Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005). Furthermore, in determining the weight to give the opinion of a

treating physician, the ALJ must should consider "the length of the treatment relationship and the frequency of examinations." Whitman, 762 F.3d at 706, citing Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007).

The court first notes that the Dr. Knopman's 2017 letter does not appear to be the incontrovertible evidence of disability that Millsap believes it to be. Even if the ALJ had explicitly cited Dr. Knopman's 2017 letter as authoritative and given it controlling weight, it is not clear whether and to what extent the RFC determination would have changed. Dr. Knopman stated broadly that Millsap was "experiencing cognitive difficulties" and "cognitive functioning issues" since around 2005. (Doc. No. 9-14, p. 88). But Dr. Knopman distinguishes these previous issues from Millsap's condition as the date of the letter, by which time her dementia has worsened to become "moderately severe." Presumably, then, her difficulties during the relevant period were less severe, although he gives no specific details as to her condition in 2010 and 2011. As his letter is ultimately devoid of specificity beyond the broad assertions of "difficulties" and "issues," is not necessarily inconsistent with ALJ's assessment of Millsap's impairments, which includes some cognitive difficulties: the ALJ found that Millsap was moderately limited with regard to concentration and pace, and mildly limited in other areas related to mental function. (Doc. No. 9-2, p. 19-20).

But even if, *arguendo*, greater reliance on Dr. Knopman's 2017 letter would indeed have resulted in a more limited RFC determination, the ALJ's decision not to proceed in such a manner was supported by substantial evidence.

First, there is the retrospective nature of the letter. It is dated April 24, 2017, refers to a diagnosis made in 2015, and opines as to cognitive difficulties starting a full decade earlier. The

length of the treating relationship and frequency of examinations are factors in determining the weight to give a treating physician's opinion. Whitman, 762 F.3d at 706. Here, it appears that Knopman saw Millsap once in 2015 and again in April 2017, but no treatment records are presented from the second visit other than the letter itself. This relatively short treating relationship and low frequency of examinations diminishes the relevance of Knopman's opinion.

Furthermore, Knopman makes no mention of medical records or other evidence he relies upon to make his assertions of cognitive difficulties stemming from 2005. Presumably he is relying on Millsap's self-reports, but his failure to articulate the basis of his opinion does not allow the Court to conclude that it was based on "medically acceptable clinical and laboratory diagnostic techniques." Whitman, 762 F.3d at 706.

Lastly, there is the matter of the other evidence of record. To be given controlling weight, a treating physician's opinion must be "not inconsistent with the other substantial evidence." Whitman, 762 F.3d at 706.   As discussed at length above, the contemporaneous medical evidence does not reflect significant limitations during the relevant period, nor does the evidence suggest the presence of limitations until several years later. To the extent that Dr. Knopman's letter does suggest severe limitations in 2010-2011 (which is not at all clear to the Court, as described above), his conclusion is inconsistent with the other evidence of record.

For all of the above reasons, the ALJ's decision not to rely on Knopman's letter to further restrict Millsap's RFC was supported by substantial evidence.

### 3.      Seratonin Syndrome

Millsap also makes arguments regarding Seratonin Syndrome. She writes:

> In January 27, 2010, Lisa Millsap was admitted into Trinity Medical Center with a probable diagnosis of Seratonin Syndrome (Exhibit 9F). She was confused, had gait difficulty and was hard to engage. Ms. Millsap had subsequent consultative exams and neuropsychological testing which detailed her major cognitive dysfunction. And, the medical professionals note that her issues were present at least from 2010.
>
> Seratonin Syndrome has many onset sources, but chiefly, anti-depressant medication and other psychotropic medicines can contribute to its onset. And, as of May 27, 2010, Ms. Millsap's amended onset date, she was an aged 50 woman significant for heart disease; depression; anxiety; and cognitive memory impairment.

(Doc. No. 12, p. 7).

Millsap argues support for this paragraph with a reference to "Exhibit 9F," cited without a page number. About halfway through Exhibit 9F's 80 pages, there is a record for a visit that occurred on January 18, 2010. See Doc. No. 9-12, p. 44. This note was *signed* on January 27, 2010, which the undersigned can only assume was misinterpreted by counsel as a visit date. During the visit – which was an appointment with a therapist, *not* a hospital admission – Millsap and Amsbaugh discussed Millsap's primary care physician's concern about serotonin syndrome, a potential side effect of a drug Millsap was taking. Amsbaugh writes, "I did review signs and symptoms of serotonin syndrome including confusion, difficulty with gait, and we did review the emergency symptoms. I did refer her to the Mayo.com for a printout…" After some more discussion, Amsbaugh announces her plan to continue Millsap on the current medication regimen, because Millsap reports that she is "doing wonderful."

At first glance, it seems improbable that the above encounter could be the source of Millsap's allegation that she was admitted to the hospital for serotonin syndrome, despite the similarity between the date that this alleged admission took place and the date the therapy note was signed. Accordingly, allowing for the possibility that counsel gave both the wrong exhibit

number *and* the wrong date in the brief, the undersigned performed a careful review of the entire administrative record *beyond* Exhibit 9F for any hint of the supposed hospital visit. The search was fruitless. Millsap occasionally mentions concerns about serotonin syndrome, but her providers assured her that the risk was quite low. See, e.g., Doc. No. 9-12, p. 50. The Court cannot see how Millsap's counsel interpreted review of potential side effects as a hospital admission and diagnosis. No further discussion appears warranted.

### 4.      Melbourne's Testimony

Lastly, Millsap claims her husband's testimony describing her functional difficulties establishes her disability prior to the date last insured. She contends that the ALJ found her/her husband's testimony not credible, and that this conclusion was erroneous. She writes that "her ability to do some chores" does not reflect an ability to perform competitive employment.

The United States responds that the ALJ did not use the term "credibility," in accordance with the governing law, and that the ALJ's consideration of Millsap's subjective complaints was proper.

As a threshold issue, the Court notes that the ALJ did not rely on or even mention Millsap's "ability to do some chores." The origin of this argument is unclear.

Overall, the Court finds the ALJ's failure to fully adopt Melbourne's account of his wife's limitations to be supported by substantial evidence. Melbourne describes someone "essentially unable to live independently," but the contemporaneous medical records tell a different story. For instance, Millsap and her husband claim that she was fired from her job in 2006 for cognitive difficulties. But in 2007, she told a therapist the following about her departure from this job:

She informs me that she is contemplating the possibility of going back to work. She states that this is not for reason of financial need as that is not the situation. She states that this idea is because her husband is concerned that she is not socially connected enough in her life. She states, however, that she enjoys being home and satisfied with the friends that she has in her life.

Today she talked about her history of her past job in which her husband had pushed her to apply for a job in a bank. She states that this is the one time that, "I let him talk me into it," referring to the decision to leave her job that she was on at the time and take on this new job. In the context of that situation, she ended up being in a very highly stressful and unhealthy environment, her anxiety increased significantly, and she experienced a significant amount of stress on that position. She states within six months of taking that job she had her heart attack and attributes that event to the stress that she incurred in this new position because of personality problems with coworkers who excluded her or would not accept her in this position. She was eventually let go from this position and she states that it was the best thing that they could have done for her.

She reports that she is now nervous about the prospect of going back to work because she is enjoying fairly stress free lifestyle at home. She has concern about increased stress going back into a work environment because of this past experience and also because she has learned in recent years that stress was a contributing leading cause in her opinion of her heart attack. She does not want this to occur again.

Doc. No. 9-12, p. 19. A.R. 544.

While Millsap certainly relates stress, it appears to relate to "personality problems" and strife with other coworkers, rather than cognitive issues. Nothing from this record appears to indicate a person unable to function to the extent Millsap's husband described.

Other records even after the date last insured show an active life. For instance, Millsap tells Amsbaugh in 2013 that her depression had decreased over the last several months, reporting her good is mood, and some days she feels happier than she has felt in a long time. Id. She is back to her activity of horseback riding and has even purchased a pony. Id. (Doc. No. 9-14 at 86).  On balance, the records simply do not support Melbourne's portrayal of someone barely with extreme difficulty functioning in daily life.

Examining the record as a whole, the Court finds that the ALJ's decision to discount some of Millsap's subjective claims was supported by substantial evidence. While Melbourne may well have testified with perfect accuracy as to Millsap's eventual condition – after all, the hearing occurred almost seven years after her date last insured – the ALJ's findings of only mild and moderate limitations during the relevant period are supported by substantial evidence.

## IV.    CONCLUSION

Having carefully reviewed the record as a whole and the parties' arguments, the Court concludes that the ALJ's decision is well-supported by substantial evidence and is within the applicable "zone of choice." While it appears Millsap may well be suffering from serious cognitive difficulties now, the reality of her date last insured precludes a finding of error.

For the above reasons, Millsap's Motion for Summary Judgment (Doc. No. 11) is **DENIED** and the Social Security Administration's Motion for Summary Judgment (Doc. No. 16) is **GRANTED**.

**IT IS SO ORDERED.**

Dated this 6th day of November, 2020.

*/s/ Clare R. Hochhalter*
Clare R. Hochhalter, Magistrate Judge
United States District Court

33